(78 South. 442)

No. 21435.

CROOM et al. v. NOEL et al.

(April 1, 1918.)

*(Syllabus by the Court.)*

1. EVIDENCE ⬤═460(6)—BOUNDARY OF LAND.

If the boundaries of a piece of land are not sufficiently defined in the act whereby it is sold, they may be established by evidence aliunde the act, including, particularly, evidence as to the construction which the parties to the contract have themselves placed on it.

2. ADVERSE POSSESSION ⬤═68—PRESCRIPTION—IMMOVABLES—STATUTE.

The ownership of immovables is prescribed for by 30 years' possession under a claim of title without the need of title or possession in good faith, all that is required being that the possession be held in the character of owner, and that it be continuous, uninterrupted, public, and unequivocal; and where it has commenced with the corporeal possession of the thing, it may, if not interrupted, in law or fact, be preserved by external signs by the continuance on the property of vestiges of works erected by the possessor, or by the continued, positive, and even negative intention to possess.

Appeal from First Judicial District Court, Parish of Caddo; J. R. Land, Judge.

Suit by C. B. Croom and others against J. S. Noel and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

Reynolds & Williams, of Arcadia, and Otis W. Bullock, of Shreveport, for appellants. J. C. Pugh & Son, of Shreveport, for appellee Standard Oil Co. of Louisiana. Alexander & Wilkinson, of Shreveport, for other appellees.

### Statement of the Case.

MONROE, C. J. Plaintiffs, as heirs of their parents, Calvin S. and Margaret A. Croom, sue for the recovery of the major interest in a tract of land, containing about four acres, bordering upon Ferry Lake, Caddo parish, which they allege is collusively and unlawfully withheld by defendants J. S. Noel, Atlas Oil Company, and Standard Oil Company, of Louisiana, and which is said somewhat to resemble in contour a horseshoe, with the toe extended into the lake and the open heel connecting it with the main line of the shore. They seek also to recover $300,000 as the value of that number of barrels of oil alleged to have been taken by defendants from the land through an oil well known as "Noel No. 1" and $50 per day for such damages as they may sustain by the further detention of the property.

Defendants Noel and the Atlas Company aver that Noel bought the land in question from plaintiffs' parents in 1876, and has held possession thereof since that time in good faith under the title so acquired; that he leased it to the Atlas Company, to be explored for oil, and that the company, with great expenditure of time, labor, and money, drilled the well mentioned in the petition, to the knowledge and in the presence of a majority of the plaintiffs, who remained silent until the expenditure resulted in the discovery of oil, leaving the possession of defendants undisturbed until the bringing of this suit in 1914; wherefore they plead estoppel and the prescription of 10 and 30 years. The Standard Company denies knowledge of any defect in the Noel title, denies collusion or fraud on its part, alleges that it bought the product of the well "Noel No. 1" from the Atlas Company in good faith, and calls that company and its lessor in warranty. It is shown that plaintiffs include most of the heirs of C. S. and M. A. Croom, who acquired the property in dispute from Timothy Mooring, who acquired it from the government.

Defendant Noel exhibits as a muniment of title a notarial act of date July 25, 1876, reading in part as follows:

"Came and appeared Margaret A. Croom, who, by and with the consent and authorization of her said husband, Calvin S. Croom, * * * declared that they, by these presents, * * * sell, convey, and deliver, with full guarantee of title and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property presently conveyed, unto James S. Noel and Eben C.

Hearne, * * * present, accepting same, the following described property, to wit, a piece of land in Mooringsport upon the bank of the lake upon which is located their steam cotton gin and mill and cotton press in fractional section 25, * * * with privilege of getting into, and out from, said gin and mill house. * * * This sale is made for the consideration of the sum of $1 cash, the receipt of which is hereby acknowledged."

On January 16, 1877, Eben C. Hearne executed an act conveying with full warranty his undivided half interest in the property so acquired to his coproprietor, Noel, the property being described as:

"A certain piece of land in fractional section 25 * * * in the town of Mooringsport, * * * together with all the buildings and improvements thereon, including mill, cotton gin, and press, and all machinery and appurtenances of the same, being the same property acquired by the parties hereto jointly from Mrs. Margaret A. Croom by an act dated July 25, 1876," etc.

It appears probable that at the time of the foregoing transactions Mooringsport was not an incorporated town, and at all events, that it was not laid off in squares and streets; that C. S. Croom was a merchant and an owner of real estate; and that, in both capacities, he was interested in having added to the business attractions of the place a cotton gin and press and gristmill. Noel, who is not shown to have previously resided there, testifies that Croom was as much interested in the enterprise as he. It is not, therefore, surprising that Croom should have been willing to contribute the site if others were willing to establish and operate the plant, the more especially as the then assessor says in his testimony. "I should think any land right at Mooringsport for building purposes would be worth something like that [$15 or $20 an acre]," and it is evident that the land contributed was not in the business center, and that its estimated area at that time was but one or two acres, the quantity available depending upon the stage of the water, which, when high, covered the place where the well Noel No. 1 is now located,

within 100 feet of the site of the gin, from which it follows that the value of the contribution may have been from $15 to $40. It appears from the language used in the act, corroborated somewhat by the testimony of Noel, that the improvements were erected before Croom conveyed title to the land; and Noel also testifies, and his testimony is corroborated, that, in order to make room for them Croom moved back his fence, and that he (Noel) built a fence which (possibly connecting with Croom's fence) extended across the neck of the point (if it can so be called) to the lake upon both sides, so that, with the water upon three sides, the point, thereafter called the "gin lot," was inclosed all around. Mr. J. E. Croom, one of the plaintiffs, testifies that it is necessary to fence in a cotton yard where cotton is rolled out after it is ginned and baled in order to keep it from being injured by cattle, and perhaps for other reasons; also that the cotton from the particular gin in question was rolled out of it, "all over the point," but that the place where the well is now located was then "the edge of the water"; the fact being that the greater part of the lot now in dispute has been taken out of the category of what might be called overflowed lands by the improvements since 1876 in the methods of dealing with the waters of the state.

It is undisputed that Noel operated his gin, press, and mill as thus established (also a woodyard, at times) from 1876 until the building through that country of the Kansas City Southern Railroad in 1895 or 1896, when he moved the gin to some point on the railroad, and that during that time his possession of the property was uninterrupted. When he moved he left a fence on the place, a boiler, a cistern, and some old machinery, and had no intention of abandoning his possession. In 1903 he rented the place to J. E. Cochran, who, finding that the fence had disappeared, rebuilt it, thereby with the water front again

inclosing the entire point, which, for 7 or 8 years, he made use of as a pasture and for the raising, so far as it was cultivable, of small crops; about half an acre near the northwest corner having been, and being now, fenced and occupied with Noel's permission by J. H. Lee, who went there in 1911, lives in a houseboat, and raises chickens, and perhaps a few vegetables. C. S. Croom lived until 1896 and his wife until 1897, and neither of them ever questioned Noel's title or right of possession, and members of his family, some of them plaintiffs herein, have lived in Mooringsport since that time and raised no such question until oil was discovered upon the land. To the contrary, on October 10, 1906, all of the heirs united in the execution of an act whereby they conveyed to J. W. Champion—

"the land in section 25, * * * known as the home place of C. S. and Margaret A. Croom, * * * being all of the land lying east and northeast of the lot or land of J. S. Noel and the point of the lake, * * * less the land sold * * * to R. T. Cole and B. F. Logan, * * * and less also the one acre sold * * * to J. S. Noel, the said one acre being known as the old ginhouse lot of said Noel, with all buildings and improvements thereon," etc.

C. B. Croom says in his testimony:

"Well, Judge, if you want me to tell you, my father gave him [Noel] the ginhouse site, and when we sold the first lot there to Champion we sold all except an acre lot where the ginhouse was. Q. Now do you mean that you sold everything except the acre upon which the ginhouse stood? A. No, sir. Q. What did you mean? A. Well, what was inclosed around there; the inclosure around the house there—that is, around the homestead; and Mr. Noel did not get any of that. Q. Mr. Noel had his ginhouse on the point down there, didn't he? A. Yes, sir. Q. And continued to have it there until the Kansas City Southern Railroad was built? A. Yes, sir. Q. Kept it and claimed it? A. Yes, where the ginhouse was. Q. The ginhouse lot? A. Yes, sir. Q. The Kansas City Southern Railroad was built in 1895 or 1896? A. Yes, sir."

At another place in his testimony we find that Mr. Croom was asked concerning a circumstance that seems to have occurred not a

great while before the discovery of oil on the land here claimed. It appears that some one was fencing in the land, or part of it, and that he notified Noel; and, defendants' counsel being curious to know why he did so, his cross-examination ran as follows:

"Q. Why did you notify him that they were fencing up his land if it belonged to you? A. I wanted him to know that they were fencing it up; it was the Croom's heirs land. Q. Well, why did you want to notify Mr. Noel that they were fencing up his land, unless he owned it? A. Well, he had a deed to where the ginhouse stood there, on the ginhouse lot, where the ginhouse was located. Q. Why did you notify him that they were fencing up his land, if it was not his? A. Well, I told him it was mine, too."

Noel corroborated the testimony so given, as to the notice that some one was fencing his land, but, not being asked about it, neither corroborates nor contradicts the statement of the witness, "I told him it was mine, too."

### Opinion.

The following excerpt from the brief filed in this court by plaintiffs' counsel sufficiently discloses the grounds relied on for a reversal of the judgment from which plaintiffs have appealed, to wit:

"First. Plaintiffs contend that the above document (referring to the conveyance to Noel) does not transfer any land for lack of definite description, except that covered by the 'steam cotton gin and mill and cotton press.'

"Second. Plaintiffs contend that the document, because of the vile price and lack of definite description, was merely a license to build and operate a 'steam cotton gin and cotton press' on Mrs. M. A. Croom's land, with the privilege of using any part of Mrs. Croom's land adjacent to and not covered by the buildings in getting into and out from the said gin and mill house."

The second contention—that Noel acquired only a license to build and operate a gin, etc., on Mrs. Croom's land—does not appear to us to be reconcilable with the exception contained in the first contention, which admits that Noel acquired, in full ownership, at least, the land covered by the "steam cotton

gin," etc.; and the first contention, we think, is founded in too narrow a construction of the description contained in the document to which counsel refer.

[1] The thing sold was partly described as "a piece of land on the bank of the lake," and we construe that part with the other, reading, "upon which is located their steam cotton gin," etc., and, giving effect to both, recognize the grantee as entitled to a piece of land which is, at the same time, on the bank of the lake and has located upon it a steam cotton gin, etc. But the fact that a lot is described as having a building on it does not necessarily imply that it is no larger than the building; and in such case if the boundaries of the lot are not sufficiently defined they may be established by evidence aliunde the act of conveyance, including particularly evidence as to the construction which the parties to the contract have themselves placed upon it. C. C. 2474; Abadie v. Lee Lumber Co., 128 La. 1014, 55 South. 658; Phelan v. Wilson, 114 La. 813, 38 South. 570; Robinson v. Atkins, 105 La. 790, 30 South. 231; Dickson v. Dickson, 36 La. Ann. 870.

[2] Beyond that, "the ownership of immovables is prescribed for by 30 years' possession under a chain of title without the need of a title or possession in good faith;" all that is required being that the possession be held in the character of owner, and that it be continuous, uninterrupted, public, and unequivocal, and where it has commenced with the corporeal possession of the thing it may, if not interrupted in law or in fact, be preserved by external signs, by the continuance on the property of vestiges of works erected by the possessor, or by the continued, positive, or even negative intention to possess. C. C. 3500, 3501, 3502, 3442, 3443, 3444. And such possession the defendants herein have shown.

The judgment appealed from is therefore affirmed.